# EXHIBIT 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10–K**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended **December 31, 2017**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to_____

**Commission File Number 001-32421**

**FUSION TELECOMMUNICATIONS INTERNATIONAL, INC.**
(Exact name of registrant as specified in charter)

| **Delaware** | **58-2342021** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (IRS Employer Identification No.) |

**420 Lexington Avenue, Suite 1718, New York, New York 10170**
(Address of principal executive offices) (Zip Code)

**(212) 201-2400**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, par value $0.01 per share | The Nasdaq Capital Market |

Securities registered pursuant to Section 12(g) of the Act: Not Applicable

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by a check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by a check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "non-accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☑ |
| (do not check if a smaller reporting company) | | Emerging growth company | ☐ |

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

The aggregate market value of the voting common stock held by non-affiliates of the registrant based upon the closing price of the common stock reported by The Nasdaq Capital Market on June 30, 2017 of $1.45 per share, was $19,148,262.

Indicate the number of shares outstanding of the registrant's common stock as of the latest practicable date: 35,579,756 shares of common stock are issued and outstanding as of March 9, 2018.

**DOCUMENTS INCORPORATED BY REFERENCE**

List hereunder the following documents if incorporated by reference and the Part of the Form 10-K (e.g., Part I, Part II, etc.) into which the

document is incorporated: (1) any annual report to security holders; (2) any proxy or information statement; and (3) any prospectus filed pursuant to Rule 424(b) or (c) under the Securities Act of 1933.

None.

**PART I**

*This Form 10-K contains forward-looking statements. These statements relate to our expectations for future events and future financial performance. Generally, the words "anticipates," "expects," "intends," "may," "should," "plans," "believes," "predicts," "potential" and similar expressions identify forward-looking statements. Forward-looking statements involve risks and uncertainties, and future events and circumstances could differ significantly from those anticipated in the forward-looking statements. These statements are only predictions. Actual events or results may differ materially. Factors which could affect our financial results are described in Item 1A of this Form 10-K. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. Moreover, neither we nor any other person assume responsibility for the accuracy and completeness of the forward-looking statements. We undertake no obligation to update any of the forward-looking statements after the date of this report to conform such statements to actual results or to changes in our expectations, except as required by law.*

## ITEM 1. BUSINESS.

### Overview

Fusion Telecommunications International, Inc. ("Fusion"), through its various subsidiaries (collectively, "we," "us," "our" or the "Company"), offers a comprehensive suite of cloud communications, cloud connectivity, cloud infrastructure, cloud computing, and managed cloud-based applications solutions to small, medium and large businesses, and offers domestic and international voice services to telecommunications carriers worldwide. Our advanced, proprietary cloud services platforms, as well as our state-of-the art switching systems, enable the integration of leading edge solutions in the cloud, increasing customer collaboration and productivity by seamlessly connecting employees, partners, customers and vendors. We currently operate our business in two distinct business segments: Business Services and Carrier Services.

In the Business Services segment, we are focused on becoming our business customers' single source for leveraging the increasing power of the cloud, providing a robust package of what we believe to be the essential services that form the foundation for their successful migration to, and efficient use of, the cloud. Our core Business Services products and services include cloud voice and unified communications as a service ("UCaaS"), improving communications and collaboration on virtually any device, virtually anywhere, and cloud connectivity services, securely and reliably connecting customers to the cloud with managed network solutions that are designed to increase quality and optimize network efficiency. Our cloud computing and infrastructure as a service ("IaaS") solutions are designed to provide our business customers with a platform on which additional cloud services can be layered. Complemented by our software as a service ("SaaS") solutions such as security and business continuity, our advanced cloud offerings, including private and hybrid cloud, storage, backup and recovery and secure file sharing that allow our customers to experience the increased efficiencies and agility delivered by the cloud. Fusion's cloud-based services are flexible, scalable and can be rapidly deployed, reducing our customers' cost of ownership while increasing their productivity.

Through our Carrier Services segment, we have agreements with approximately 370 carrier customers and vendors and sell our voice services to other communications service providers throughout the world. Customers include U.S.-based carriers sending voice traffic to international destinations, and foreign carriers sending voice traffic to the U.S. and internationally. We also purchase domestic and international voice services from many of our Carrier Services customers. Our carrier-grade network, advanced switching platform and interconnections with global carriers on six continents also reduce the cost of global voice traffic, thereby increasing profitability and expanding the service delivery capabilities for our Business Services segment. Since July 2017, our Carrier Services business has been operated through Fusion Global Services, LLC ("FGS"), which is currently 60% owned by us and 40% owned by XcomIP, LLC ("XComIP"). In connection with the Merger (as defined below), we have agreed to use reasonable best efforts to effectuate, on or prior to the closing of the Merger, to either (i) divest our 60% ownership interest in FGS, or (ii) dissolve FGS. See "Developments in 2017" below.

As a result of the acquisition of a number of cloud services businesses over the past five years, Fusion has expanded its business customer base to over 13,000 customer accounts, increased its distribution network to over 500 active distribution partners and added a significant number of network facilities and points of presence, thus expanding its geographic reach. Through these acquisitions, we acquired advanced systems and infrastructure and augmented our management team and employee base with talented, experienced, well-trained professionals, and further developed a strong platform for further acquisitions.

Fusion is seeking to capitalize on the rapid growth of the worldwide cloud services market, which is expected to grow at a three-year compound annual growth rate (CAGR) of 16.5% to total $411.4 billion, up from $260.2 billion in 2017, according to Gartner, Inc. The highest growth is expected to come from cloud system infrastructure as a service, which is projected to grow at a 27.7% CAGR from 2017 to 2020 to reach $72.0 billion, while cloud application services (SaaS) is expected to grow at a 19.4% CAGR from 2017 to 2020 to reach $100.0 billion. We are pursuing a three-tiered growth strategy, consisting of (i) developing specialized solutions for key vertical markets (such as legal and healthcare); (ii) targeting and acquiring additional cloud services companies; and (iii) implementing measures to accelerate organic growth. Our continuing effort to deliver advanced cloud solutions to larger companies with more complex requirements is supported by our proprietary cloud solutions platform that allows us to rapidly respond to large enterprise needs for customized or enhanced solutions. We intend to continue to develop vertically oriented solutions to expand our revenue opportunities and further differentiate our service suite, with current efforts directed primarily on the healthcare, legal, hospitality and real estate verticals. We also intend to acquire additional cloud services companies that can further expand our customer base, allow us to provide additional cloud products and services to our portfolio and gain scale. Our growth strategy for the Business Services segment includes securing large strategic distribution partners, increasing our direct as well as indirect channel sales efforts and upselling solutions to our existing customer base.

Fusion's management team has extensive experience in the technology, services and communications industry, with demonstrated leadership in middle market, entrepreneurial, small company, distressed and M&A environments. We believe that our executive team has the experience and expertise to drive high value opportunities to the Company and execute on our acquisition and organic growth strategies.

Fusion was incorporated in Delaware and commenced operations in September 1997. We currently have offices in: New York, NY; Fairfield, NJ; Fort Lauderdale, FL; Atlanta, GA; Redondo Beach, CA; Austin, TX; Herndon, VA; and Beachwood, OH.

*Developments in 2017*

On August 26, 2017, Fusion and its wholly-owned subsidiary, Fusion BCHI Acquisition LLC, a Delaware limited liability company ("Merger Sub"), entered into an Agreement and Plan of Merger, as amended (the "Merger Agreement") with Birch Communications Holdings, Inc., a Georgia corporation ("Birch"). The Merger Agreement provides, among other things, that upon the terms and conditions set forth therein, Birch will merge with and into Merger Sub (the "Merger"), with Merger Sub surviving the Merger. Birch, through its subsidiaries, provides IP-based communications, cloud and managed services to businesses in all 50 states, the District of Columbia and Canada under the Birch and Primus brands. Birch provides voice, broadband, Internet access, hosted services, managed services, wireless voice, wireless data and other communications, cloud and managed services to its customer base comprised of small, midsized, and enterprise businesses.

On the effective date of the Merger, the outstanding shares of common stock, par value $0.01 per share, of Birch (other than treasury shares or shares owned of record by any Birch subsidiary) will be cancelled and converted into the right to receive, in the aggregate, that number of shares of our common stock equal to three times the number of shares of (i) our common stock issued and outstanding immediately prior to the Effective Time (as defined in the Merger Agreement) (but excluding the shares of our common stock issued by us in a public offering of our shares of common stock completed in February 2018 as well as certain other issued and outstanding shares of our common stock (see "Recent Amendments to Merger Agreement and East West Bank Waiver" below)), *plus* (ii) our common stock issued or issuable upon the conversion of all classes or series of our preferred stock outstanding immediately prior to the closing of the Merger, *plus* (iii) our common stock issuable upon the exercise of all in-the-money Fusion warrants (collectively, the "Merger Shares"). Pursuant to subscription agreements executed by each of the stockholders of Birch, the Merger Shares will be issued in the name of, and held by BCHI Holdings, LLC ("BCHI"), a limited liability company owned by the stockholders of Birch. On the closing date of the Merger, BCHI and Fusion will enter into a Registration Rights Agreement governing the registration rights of BCHI in respect of the Merger Shares and pursuant to which we will agree, among other things, to use our reasonable best efforts to cause a shelf registration statement covering the resale of the Merger Shares to be declared effective by the SEC within 120 days of the closing of the Merger.

Closing of the Merger is subject to numerous conditions, including (i) receipt of the requisite approval of Fusion's voting shares, which approval was secured by the Company on February 21, 2018, (ii) Fusion obtaining financing for the transaction, which will be used to retire existing senior debt facilities at Birch and Fusion, (iii) all existing shares of our preferred stock being converted into shares of our common stock, and (iii) Fusion using its reasonable best efforts to cause the Merger Shares to be approved for listing on The Nasdaq Stock Market, LLC ("Nasdaq"), including, if necessary, in order to comply with Nasdaq listing requirements, amending Fusion's existing certificate of incorporation prior to the effective time of the Merger to effect a reverse stock split of our common stock to satisfy Nasdaq's minimum pricing requirements (the "Reverse Stock Split"). If the Reverse Stock Split must be completed prior to the closing of the Merger, it will be in a range of up to 5:1, with the final ratio to be determined by our existing board.

In addition, prior to the closing of the Merger, Birch is required to spin-off to the existing Birch shareholders, its US-based consumer business, which consists of (i) the residential customer base, life line and consumer wireless business in the United States, and (ii) its single-line business customer base in the United States. In addition, as discussed above, we have agreed that on or prior to the consummation of the Merger, we will use our reasonable best efforts, on or prior to the closing of the Merger, to either (i) divest our 60% ownership interest in FGS, or (ii) dissolve FGS.

3

On the effective date of the Merger, our certificate of incorporation will be amended and restated, which amendments will, among other things, (i) increase the number of authorized shares of our common stock to 150 million and (ii) change our name to "Fusion Connect, Inc." From and after the effective time of the Merger, the size of our Board will be fixed at seven directors. Three directors, including at least one director who satisfies the Nasdaq listing standard's independence requirements, will be nominated by a nominating committee comprised of our directors serving on the Board on the date of the nomination and three directors, including at least one that satisfies the Nasdaq listing standard's independence requirements, will be nominated by BCHI. The seventh director, who must satisfy the Nasdaq listing standard's independence requirements, will be nominated by BCHI, subject to the reasonable consent of the Fusion committee. Our Chief Executive Officer, Matthew D. Rosen will serve as the post-Merger Chairman of the Board, and Holcombe T. Green, Jr., a principal stockholder of Birch, will serve as the post-Merger Vice Chairman of the Board. Information relating to the post-Merger Fusion Board and its executive officers will be included in a Form 14F-1 to be filed and mailed to all stockholders of the Company no less than 10 days prior to consummation of the Merger. The Merger is currently expected to be completed by mid-April 2018.

The terms of the Merger Agreement are such that the Merger, if consummated, will result in a change in control. As a result, the transaction will be accounted for as a reverse acquisition and recapitalization, with Birch as the acquirer for accounting purposes, and the historical financial statements of Birch (other than the Statements of Stockholders' Equity) will become the historical financial statements of the Company.

### *Recent Amendments to the Merger Agreement and East West Bank Waiver*

On January 24 and January 25, 2018, the parties to the Merger Agreement entered into a Fourth and Fifth Amendment to the Merger Agreement, respectively. The primary purpose of the Fourth Amendment was to further extend that date by which either Fusion or Birch may terminate the Merger Agreement due to an inability to secure commitments for the required financing from 120 days from the date of the Merger Agreement to 220 days from the date thereof (i.e., April 3, 2018). Under the Fourth Amendment, the parties also agreed to exclude up to 300,000 shares of our common stock to be issued in connection with the IQmax, Inc. asset acquisition (as described below) from the calculation of the number of Merger Shares to be issued to BCHI at the closing of the Merger. In addition, the Fourth Amendment also revised Exhibit D to the Merger Agreement (which exhibit described the proposed spin-off of the Birch consumer business required as a condition precedent to the closing) to exclude references to the Canadian business of Birch as the parties have agreed that such assets and customers will transfer to Fusion at the closing of the Merger.

Under the Fifth Amendment to the Merger Agreement, the parties agreed to increase the dollar amount of cash that Fusion could raise by issuing equity or debt securities in connection with capital raising activities prior to the closing of the Merger from $10.0 million to $40.0 million net proceeds) and also agreed that any shares of common stock issued by us in this offering in an amount up to $40.0 million (net proceeds) would be excluded in determining the number of Merger Shares to be issued to BCHI at the closing of the Merger.

On January 26, 2018, we obtained a waiver under our senior secured credit facility with East West Bank (the "East West Bank Credit Facility") permitting us to sell up to approximately $30.0 million (net proceeds) of our common stock without having to use any of those proceeds to prepay amounts outstanding under that facility (the "January 2018 EWB Waiver"). Prior to receiving the January 2018 EWB Waiver, we were obligated under the East West Bank Credit Facility to use any net proceeds for any sale of our equity securities that are in excess of $4.0 million to pay down outstanding borrowings thereunder. In addition, on February 23, 2018 we obtained an additional waiver under the East West Bank Credit Facility permitting us to retain the entire amount of the net proceeds from the recently completed equity offering.

On March 12, 2018, the parties to the Merger Agreement entered into a Sixth Amendment to the Merger Agreement, the sole purpose of which was to amend the Merger Agreement and the associated form of stockholders agreement to reduce the number of directors that will initially serve on the post-Merger Board from nine to seven.

### *February 2018 Public Offering of shares of Our Common Stock*

On February 5, 2018, we closed an offering of 12,937,500 shares of our common stock, including 1,687,500 shares for which the underwriters exercised their over-allotment option in full, at a price to the public of $3.20 per share for gross proceeds of $41.4 million. The net proceeds, after underwriting discounts and commissions, but before estimated expenses of the offering payable by Fusion, were $38.7 million. As noted above, the shares sold in this offering will not be counted as issued and outstanding for purposes of calculating the number of shares of Fusion common stock to be issued as consideration to BCHI in connection with the closing of the Merger. As a result, on a post-closing basis, the dilutive effect of this offering will be shared pro rata by current Fusion and Birch shareholders with current Fusion shareholders bearing approximately 25% of the dilution and current Birch shareholders bearing approximately 75% of the dilution from this offering. Craig-Hallum Capital Group LLC acted as the sole book-running manager and B. Riley FBR, Inc. acted as a co-manager for the offering

4

While we believe VoIP services may be subject to additional federal, state, local, or international regulation in the future, it's uncertain when or how the effects of such regulation could affect us and our business. If additional regulation does occur, it is possible that such regulatory agencies may impose surcharges, taxes or regulatory fees on VoIP service providers. The imposition of any such surcharges, taxes, or regulatory fees could increase the Company's costs and thus reduce or eliminate any competitive advantage that we might enjoy today.

### Employees

As of December 31, 2017, we had 271 employees, all of which were full time employees. None of our employees is represented by a labor union or collective bargaining agreement. We believe that the relationship between us and our employees is good and, to date, we have not experienced a work stoppage.

### Customer Concentrations and Revenues and Assets by Geographic Area

For the years ended December 31, 2017 and 2016, no single customer accounted for more than 10% of the Company's consolidated revenues or accounts receivable.

During the years ended December 31, 2017 and 2016, 91.8% and 89.5%, respectively, of the Company's revenue was derived from customers in the United States and 8.2 % and 10.5%, respectively, was derived from international customers. As of December 31, 2017 and 2016, the Company had no assets located outside of the United States.

### Available Information

Our principal executive offices are located at 420 Lexington Avenue, Suite 1718, New York, New York 10170. The telephone number at our executive offices is 212-201-2400 and our main corporate website is www.fusionconnect.com. The information on the Company's website is neither a part of, nor incorporated by reference into, this report.

We make available our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, proxy statements and amendments to those reports and statements filed or furnished pursuant to Section 13(a), Section 15(d) or Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), free of charge on our website, www.fusionconnect.com, as soon as reasonably practicable after they are electronically filed with, or furnished to, the Securities and Exchange Commission (the "SEC"). Additionally, copies of materials filed by us with the SEC may be accessed at the SEC's Public Reference Room at 100 F Street, N.E., Washington, DC 20549, between the hours of 10:00 am to 3:00 pm, or at the SEC's website www.sec.gov. For information about the SEC's Public Reference Room, please call 1-800-SEC-0339.

## ITEM 1A. RISK FACTORS

*An investment in our securities involves a high degree of risk. You should carefully consider the risk factors described below in evaluating our future prospects. In particular, keep these risk factors in mind when you read "forward-looking" statements elsewhere in this report. Forward-looking statements relate to our expectations for future events and time periods. Generally, the words "anticipates," "expects," "intends," "may," "should," "plans," "believes," "predicts," "potential" and similar expressions identify forward-looking statements. Forward-looking statements involve risks and uncertainties, and future events and circumstances could differ significantly from those anticipated in the forward-looking statements. Any of the following risks could harm our business, operating results or financial condition and could result in a complete loss of your investment. Additional risks and uncertainties that are not yet identified or that we currently think are immaterial may also harm our business and financial condition in the future.*

### Risks Relating to Our Business

### Failure to comply with the financial and other covenants contained in our senior debt facilities is an event of default under these agreements.

Our acquisitions have been financed primarily through the issuance of secured debt with an aggregate principal amount outstanding of approximately $97.6 million at December 31, 2017. Currently, all assets of Fusion and its subsidiaries are pledged as collateral under its senior debt facilities. These facilities contain a number of affirmative and negative covenants, including but not limited to, restrictions on the payment of subordinate indebtedness, incurring additional indebtedness, making capital expenditures, paying dividends and cash distributions by subsidiaries. Under these senior facilities, we are also required to comply with various financial covenants, including leverage ratio, fixed charge coverage ratio and minimum levels of earnings before interest, taxes, depreciation and amortization, or EBITDA. Failure to comply with any of the restrictive or financial covenants contained in these facilities could result in an event of default and accelerated demand for repayment of our outstanding debt. We do not have the financial resources to repay our senior debt if it is accelerated.

As of September 30, 2016, we were not in compliance with the leverage ratio covenants contained in our senior credit facilities, and we received waivers and amendments from the lenders under these facilities as of September 30, 2016. After giving effect to the foregoing waiver, we were in compliance with all of the financial covenants contained in our debt agreements for the years ended December 31, 2017 and 2016. There can be no assurances however, that we will continue to be able to obtain such waivers in the future if we do not comply with the financial covenants contained in our credit facilities.

*We have a history of operating losses and net losses. There can be no assurance that we will ever achieve profitability or have sufficient funds to execute our business strategy.*

At December 31, 2017 and 2016, we had a working capital deficit of $15.4 million and $6.6 million, respectively. At December 31, 2017, we had a stockholders' deficit of $1.2 million and at December 31, 2016, we had stockholders' equity of $9.2 million. In addition, at December 31, 2017 and 2016, we incurred net losses applicable to common stockholders of $15.9 million and $15.1 million, respectively. Our cash flows from operations for the year ended December 31, 2017 were not sufficient to support our capital expenditure requirements and other obligations in 2017. We may not be able to generate profits in the future and may not be able to support our operations or otherwise establish a return on invested capital. In addition, we may not have sufficient funds to execute our business strategy, requiring us to raise additional funds from the equity markets or other sources, resulting in further dilution to our equity holders. These losses, among other things, have had, and may continue to have, an adverse effect on our working capital, total assets and stockholders' equity.

*The cloud services industry is highly competitive and we may be unable to compete effectively.*

The cloud services industry is highly competitive, rapidly evolving and subject to constant technological change. In addition, many of our current cloud services competitors are significantly larger and have substantially greater market presence; greater financial, technical, operational and marketing resources; and more experience. In the event that any competitor expends significant sales and marketing resources in one or several markets where we compete with them, we may not be able to compete successfully in those markets. We also believe that competition will continue to increase, placing downward pressure on prices. Such pressure could adversely affect our gross margins if we are not able to reduce our costs commensurate with the price reductions of our competitors. In addition, the pace of technological change makes it impossible for us to predict whether we will face new competitors using different technologies to provide the same or similar services offered or proposed to be offered by us. If our competitors were to provide better and more cost effective services, we may not be able to increase our revenues or capture any significant market share.

*Our business is capital intensive, and we do not currently generate sufficient revenue to offset our operating expenses. If we are unable to obtain additional funding when required, we may have to significantly curtail or possibly terminate some of our operations.*

We may require future capital in order to continue to fund our operating expenses and to continue to otherwise execute our business plan and growth strategy. If we are unable to obtain the required funding or generate revenue sufficient to sustain our operations, we could be forced to significantly curtail or suspend our operations, including laying-off employees and selling assets. Additional capital may not be available to us when needed or on terms that are acceptable to us, or at all.

We have historically funded our working capital requirements through the sale of equity securities of Fusion. The sale of equity securities to fund operations is dilutive to our existing stockholders. The terms of our debt facilities currently and may in the future limit our ability to utilize cash flows generated from our Business Services segment to fund the Company's other operations, including corporate overhead expenses. In the event we are unable to substantially increase our revenue to fund our operating expenses, we may be required to continue to fund operations through additional sales of Fusion's equity securities. In the past, limited cash resources restricted our Carrier Services segment's ability to purchase termination capacity with longer payment terms than the terms under which it is able to sell services to its customers. Should this trend continue, and should FGS not be disposed of as contemplated by the Merger Agreement, it could limit our ability to grow our revenues and/or margins, or limit our ability to achieve our revenue and/or margin targets in this segment.

13

*If we are unable to manage our growth or implement our expansion strategy, we may increase our costs without increasing our revenue.*

We may not be able to expand our product offerings, customer base and markets, or implement the other features of our business strategy at the rate, or to the extent, presently planned. Our projected growth will place a significant strain on our administrative, operational and financial resources and may increase our costs. If we are unable to successfully manage our future growth, continue to upgrade our operating and financial control systems, recruit and hire necessary personnel or effectively manage unexpected expansion difficulties, we may not be able to maximize revenue or achieve profitability.

*Our ability to grow our business is dependent upon market developments and traffic patterns, which may lead us to make expenditures that do not result in increased revenue.*

Our purchase of network equipment and software will be based, in part, upon our expectations concerning future revenue growth and market developments. As we expand our network, we will be required to make significant capital expenditures, including the purchase of additional network equipment and software. To a lesser extent, our fixed costs will also increase from the ownership and maintenance of a greater amount of network equipment including our switching systems, gateways, routers and other related systems. If our traffic volume were to decrease, or fail to increase to the extent expected or necessary to make efficient use of our network, our costs as a percentage of revenue would increase significantly.

*Changes in technology and service offerings could affect the ability of our Business Services segment to compete in the marketplace for cloud communications services.*

Our Business Services segment is subject to rapid and significant changes in technology, particularly in the emerging areas of cloud voice, cloud connectivity, cloud storage and cloud computing. Our industry has evolved significantly in these areas over the past few years, and is expected to continue to evolve. Emerging technologies could lead to the development of newer, more convenient, more cost-effective or otherwise more attractive services. In addition, the preferences and requirements of business customers are changing rapidly. Our ability to retain current customers and attract new customers may be highly dependent on whether we choose the technologies that will ultimately have the greatest customer acceptance, are able to adopt these new technologies and offer competitive new services when appropriate, or can compete successfully against other service providers that use these new technologies, many of whom are larger or possess greater financial or technical resources than we do. The development, introduction and marketing of such new services in response to new technologies or new customer demands may require us to increase our capital expenditures significantly. In addition, new technologies may be protected by patents or other intellectual property laws and therefore may only be available to our competitors and not to us.

*Some of our services are dependent upon multiple service platforms, network elements, and back-office systems that are reliant on third party providers.*

We have deployed back-office systems and services platforms that enable us to offer our customers a wide-array of services and features. Sophisticated back office information and processing systems are vital to our continued growth and our ability to continue to monitor costs, invoice customers, provision client orders, and achieve operating efficiencies. Some of these systems are dependent upon license agreements with third party vendors. These third party vendors may cancel or refuse to renew some of these agreements, and the cancellation or non-renewal of these agreements may harm our ability to invoice customers and provide services efficiently.

*Our business could be materially and adversely affected in the event of accusations of infringement of third-party intellectual rights.*

There has been substantial litigation in the areas in which we operate regarding intellectual property rights. Regardless of the merits, accusations and lawsuits concerning claims of infringement or misuse of another party's proprietary rights may negatively affect customer relationships, may divert management's attention away from other aspects of our operations and, upon resolution may have a material adverse effect on our business, results of operations, financial condition and cash flows.

If we were found to be infringing on the intellectual property rights of a third party, we could be subject to liability for such infringement, which could be material. We could also be prohibited from selling certain services or required to redesign certain services, each of which could have a material adverse effect on our business and results of operations. These and other outcomes may result in the loss of a substantial number of existing customers or prevent our acquisition of new customers; cause us to pay license fees for intellectual property we are found to have infringed; cause our costs to increase; materially and adversely affect our brand in the marketplace and cause a substantial loss of good will; and cause us to cease certain services or offering certain features.

*We rely upon certain proprietary rights in our technology, systems and business processes. If our protection of these rights were to be compromised, it could negatively affect our ability to compete or to achieve our projected business and financial results.*

Our ability to compete depends, in part, upon our proprietary rights in our technology, systems and business processes. In general, our technology is based on the integration and use of publicly available hardware components, and is therefore afforded little protection under existing patent law. Some of our software and systems, while developed by us, are generally not unique in such a manner as to allow protection under existing patent law. As a result, we generally rely on a combination of contractual restrictions and the general protection afforded by copyright, trademark and trade secret laws to establish and protect our proprietary rights. Such limited protection could prove insufficient and thereby subject us to increased competition or impact the business or financial results of our operations.

It is the Company's policy to require employees, consultants and, when warranted, certain customers and vendors to execute confidentiality agreements with us. These agreements provide that confidential information developed or made known during the course of the relationship must be kept confidential and not disclosed to third parties except under certain limited circumstances. If such arrangements were to prove ineffective in protecting our confidential information, our business or financial performance could be negatively impacted.

The U.S. Patent and Trademark Office has granted Fusion federal registration for eight trademarks, and Federal registration of those trademarks will be effective for as long as we continue to use them and renew their registrations. We may register additional trademarks and other intellectual property rights in the future, although there can be no assurance that our effort to register these trademarks will be successful. Fusion generally does not register any of its copyrights with the U.S. Copyright Office, but relies on the protection afforded to such copyrights by the U.S. Copyright Act, which provides protection to authors of original works whether published or unpublished and whether registered or unregistered.

***Vulnerabilities to security breaches, cyber intrusions and other malicious acts could adversely impact our business.***

In the current environment, there are numerous and evolving risks to cybersecurity and privacy, including criminal hackers, state-sponsored intrusions, industrial espionage, employee malfeasance, and human or technological error. Computer hackers and others routinely attempt to breach the security of technology products, services, and systems such as ours, and those of customers, third-party contractors and vendors.

Our operations depend on our ability to protect our network from interruption by damage from unauthorized entry, computer viruses or other events beyond our control. In the past, we may have been subject to denial or disruption of service ("DDOS"), and we may be subject to DDOS attacks in the future. We cannot assure you that our backup systems, regular data backups, security protocols, DDOS mitigation and other procedures that are currently in place, or that may be in place in the future, will be adequate to prevent significant damage, system failure or data loss. Critical to our provision of service is the storage, processing, and transmission of confidential and sensitive data. We store, process and transmit a wide variety of confidential and sensitive information including credit card, bank account and other financial information, proprietary, trade secret or other data that may be protected by intellectual property laws, customers' and employees' personally identifiable information, as well as other sensitive information. We, along with others in the industry, will be subject to cyber threats and security breaches, given the nature of the information we store, process and transmit.

Depending on the evolving nature of cyber threats and the measures we may have to implement to continue to maintain the security of our networks and data, our profitability may be adversely impacted or we may have to increase the price of our services which may make our offerings less competitive with other communications providers.

If an individual obtains unauthorized access to our network, or if our network is penetrated, our service could be disrupted and sensitive information could be lost, stolen or disclosed which could have a variety of negative impacts, including legal liability, investigations by law enforcement and regulatory agencies, and exposure to fines or penalties, any of which could harm our business reputation and have a material negative impact on our business. In addition, to the extent we market our services as compliant with particular laws governing data privacy and security, such as HIPAA (Health Insurance Portability and Accountability Act) and the Gramm-Leach-Bliley Act, any security breach that exposes protected information may make us susceptible to a number of claims related to our marketing.

Many governments have enacted laws requiring companies to notify individuals of data security incidents involving certain types of personal data. In addition, some of our customers contractually require notification of any data security compromise. Security compromises experienced by our competitors, by our customers or by us may lead to public disclosures, which may lead to widespread negative publicity. Any security compromise in our industry, whether actual or perceived, could harm our reputation, erode customer confidence in the effectiveness of our security measures, negatively impact our ability to attract new customers, cause existing customers to elect not to renew their contracts with us or subject us to third-party lawsuits, regulatory fines or other action or liability, which could materially and adversely affect our business and operating results.

In contracts with larger enterprises, we sometimes agree to assume liability for security breaches in excess of the amount of committed revenue from the contract. In addition, there can be no assurance that any limitations of liability provisions in our contracts for a security breach would be enforceable or adequate or would otherwise protect us from any such liabilities or damages with respect to any particular claim. We also cannot be sure that our existing general liability insurance coverage and coverage for errors or omissions will continue to be available on acceptable terms or will be available in sufficient amounts to cover one or more large claims, or that the insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage, or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could have a material adverse effect on our business, financial condition and operating results.

15

***Our revenue growth is dependent upon our ability to build new distribution relationships and to acquire new customers.***

Our ability to grow through efficient and cost effective deployment of our cloud services is, in part, dependent upon our ability to identify and contract with local, regional and national entities that will assist in the distribution of our products and services. If we are unable to identify, contract with or maintain such distribution relationships, or if the efforts of these agents are not successful, we may not grow the customer base or achieve the revenue level currently envisioned and our results of operations will be adversely impacted.

***We are dependent upon our ability to obtain the necessary regulatory approvals and licenses to enter new domestic and international markets in which such approvals are required. Such approvals may or may not occur as planned and could be delayed.***

Our ability to enter into new domestic and international markets may, in certain cases, rely upon our ability to obtain licenses or other approvals to operate in those markets, our ability to establish good working relationships with the relevant regulatory authorities in those jurisdictions or our ability to interconnect to the local telephone networks in those markets. If we are not able to obtain the necessary licenses, approvals or interconnections, our ability to enter these new markets may be delayed or prevented.

***Industry consolidation could make it more difficult for us to compete.***

Companies offering cloud voice, UCaaS, cloud connectivity, SaaS, IaaS and other cloud services are, in some circumstances, consolidating. We may not be able to compete successfully with businesses that have combined, or will combine, to produce companies with substantially greater financial, technical, sales and marketing resources, or with larger client bases, more extended networks or more established relationships with vendors and distributors. If we were to experience such heightened competitive pressures, there is a risk that our revenues may not grow as expected and the value of our equity securities could decline.

***Our ability to provide services is often dependent on our suppliers and other service providers who may not prove to be reliable.***

A majority of the voice calls made by our customers are connected through other communication carriers, which provide us with transmission capacity through a variety of arrangements. Our ability to terminate voice traffic in our targeted markets is an essential component of our ongoing operations. If we do not secure or maintain operating and termination arrangements, our ability to increase services to our existing markets and gain entry into new markets will be limited. Therefore, our ability to maintain and expand our business is dependent, in part, upon our ability to maintain satisfactory relationships with other domestic carriers, Internet service providers, international carriers, fiber optic cable providers and other service providers, many of which are our competitors, and upon our ability to obtain their services on a cost effective basis. In addition, if a carrier with whom we interconnect does not carry the traffic routed to it, or does not provide the required capacity, we may be forced to route our traffic to, or buy capacity from, a different carrier on less advantageous terms, which could reduce our profit margins or degrade our network service quality. In the event network service quality is degraded, it may result in a loss of customers. To the extent that any of these carriers with whom we interconnect raise their rates, change their pricing structure or reduce the amount of capacity they will make available to us, our revenues and profitability may be adversely affected.

***We rely on third party equipment suppliers who may not be able to provide us the equipment necessary to deliver the services that we seek to provide.***

We are dependent on third party equipment suppliers, including Cisco, BroadSoft, Acme Packet and Sonus, for equipment, software and hardware components. If these suppliers fail to continue product development and research and development or fail to deliver quality products or support services on a timely basis, or if we are unable to develop alternative sources of supply if and as required, such a failure could result in an inability to deliver the services that we currently provide or intend to provide, and our financial condition and results of operations may be adversely affected.

***FGS's Carrier Services business relies on the cooperation of other international carriers and incumbent service providers, who may not always cooperate with us in our attempt to serve a specific country or market.***

In some cases, the growth of the FGS Carrier Services business requires the cooperation of other international carriers and/or the incumbent service provider in order to provide services to or from specific countries or markets. In the event the incumbent, or another in-country international carrier, does not cooperate with FGS or support FGS in its efforts to serve that country, its ability to provide service to or from that country may be delayed, or the costs to provide service might increase should it be forced to use another more expensive carrier. If FGS is unable to develop and maintain successful relationships with other international carriers and incumbent operators, its ability to cost-effectively service an important market could be adversely affected.

16

***Because we do business on an international level, we are subject to an increased risk of tariffs, sanctions and other uncertainties that may hurt our revenue.***

There are certain risks inherent in doing business internationally, especially in emerging markets, such as unexpected changes in regulatory requirements, the imposition of tariffs or sanctions, licenses, customs, duties, other trade barriers, political risks, currency devaluations, high inflation, corporate law requirements and civil unrest. Many of the economies of these emerging markets are weak and volatile. FGS may not be able to mitigate the effect of inflation on its operations in these countries by price increases, even over the long-term. Also, deregulation of the communications markets in developing countries may or may not continue. Incumbent service providers, trade unions and others may resist legislation directed toward deregulation and may resist allowing FGS to interconnect to their networks. The legal systems in emerging markets also frequently have insufficient experience with commercial transactions between private parties, therefore FGS may not be able to protect or enforce its rights in some emerging market countries. Governments and regulations may change, thus impacting the availability of new licenses or the cancellation or suspension of existing operating licenses. The instability of the laws and regulations applicable to the FGS Carrier Services business, as well as their interpretation and enforcement, could materially impact its business in those countries and adversely affect its and our financial condition or results of operations.

The regulatory treatment of VoIP outside the United States varies from country to country. Some countries are considering subjecting VoIP services to the regulations applied to traditional telephone services and they may assert that FGS is required to register as a telecommunications carrier in that country or impose other more onerous regulations. In such cases, our failure to register could subject us to fines, penalties or forfeiture of our right to do business in that country. Regulatory developments such as these could have a material adverse effect on our ability to grow our international Business Services operations.

***Additional taxation and government regulation of the cloud communications industry may slow our growth, resulting in decreased demand for our products and services and increased costs of doing business.***

As a result of changes in regulatory policy, we could be forced to pay additional taxes on the products and services we provide. We structure our operations and our pricing based on assumptions about various domestic and international tax laws, tax treaties and other relevant laws. Taxation authorities or other regulatory authorities might not reach the same conclusions about taxation that we have reached in formulating our assumptions. We could suffer adverse tax and other financial consequences if our assumptions about these matters are incorrect or the relevant laws are changed or modified. In the U.S., our products and services are subject to varying degrees of federal, state and local regulation, including regulation by the FCC and various state public utility commissions. We may also be subject to similar regulation by foreign governments and their telecommunications and/or regulatory agencies. While these regulatory agencies grant us the authority to operate our business, they typically exercise minimal control over our services and pricing. However, they do require the filing of various reports, compliance with public safety and consumer protection standards and the payment of certain regulatory fees and assessments.

We cannot assure you that applicable U.S. and foreign regulatory agencies will grant us the required authority to operate, will allow us to maintain existing authority so we can continue to operate or that such agencies will refrain from taking action against us if we are found to have provided services without obtaining the necessary authority. Similarly, if our pricing and/or terms and conditions of service are not properly filed or updated with the applicable agencies, or if we are otherwise not fully compliant with the rules of the various regulatory agencies, regulators or other third parties could challenge our actions and we could be subject to forfeiture of our authority to provide service, or to penalties, fines, fees or other costs.

We also hold various state licenses authorizing us to provide intrastate services to our carrier and end-user customers, and we comply with state reporting, fee payment, tariffing and other obligations with respect to these services. However, in several states where we provide de minimus intrastate services we may not have fully complied with applicable licensing requirements. Should we fail at any time to hold the licenses required to provide our intrastate services, we could be subject to fines or other penalties.

***In addition to new regulations being adopted, existing laws may be applied to the Internet, which could hinder our growth.***

New and existing laws may cover issues that include: sales and other taxes; user privacy; pricing controls; characteristics and quality of products and services; consumer protection; cross-border commerce; copyright, trademark and patent infringement; and other claims based on the nature and content of Internet materials. Changes to existing regulations or the adoption of new regulations could delay growth in demand for our products and services and limit the growth of our revenue.

***The effects of natural disasters such as hurricanes or other events over which we have no control could significantly disrupt our operations and could have a material adverse impact on our business.***

Our Carrier Services operations were impacted by Hurricane Sandy in the Northeast region of the United States in late October of 2012. The severe weather conditions directly affected the ability of many of our carrier customers and vendors to connect to us. As a result, we did not generate the same levels of revenues and gross profit that we believe we would have generated absent these abnormal conditions. Any future disruptions to the operation of FGS' network (should it not be disposed of as contemplated by the Merger Agreement) or Fusion's network, including acts of war, terrorism or other force majeure events, could have a material adverse impact on our liquidity, financial condition and results of operations. Although we do carry business interruption insurance, we cannot assure you that our losses in the event of a natural disaster or other force majeure event would be completely covered by insurance.

***If we do not retain our executive officers and senior management, or if we do not continue to attract and retain qualified personnel and independent sales agents, our ability to execute our business plan could be adversely affected.***

Our existing executive officers and senior management have extensive experience in the communications industry, as well as many years of working together as an integrated management team directing our day-to-day operations. As a result, we are dependent on those individuals and the loss of the services of one or more of these individuals could impair our ability to execute our strategy or achieve our business and financial objectives.

We do not have written employment agreements with any of our executive officers or other members of our senior management team except for Matthew Rosen, our Chief Executive Officer.

We face competition for qualified personnel, including management, technical, financial and sales personnel. We also rely on independent sales agents to market and sell our services. If we are unable to attract and retain experienced and motivated personnel, including independent sales agents, the growth of our business or the effectiveness of our day-to-day operations may be negatively impacted and we may not be able to grow our customer base or achieve our business or financial objectives.

**Risks Related to the Merger**

***The Merger may not be completed within the expected timeframe or at all, and the failure to complete the Merger may negatively affect the trading price of our common stock and could adversely affect our future business and financial results.***

The Merger continues to be subject to a number of risks and uncertainties, including (1) we and Birch may not be able to obtain the financing necessary to complete the Merger; (2) we and Birch may not obtain all necessary regulatory approvals or such approvals may not be obtained in a timely fashion; and (3) timely satisfaction of all other closing conditions to the Merger. Failure to complete the Merger or significant delays in its completion could negatively affect the trading price of our common stock, adversely affect our future business and financial results and could result in our failure to timely realize certain synergies relating to such acquisition.

***Our existing stockholders will experience substantial dilution if the Merger is consummated.***

If the Merger is consummated, the Birch stockholders (through BCHI) will receive consideration, in the aggregate, equal to three times the Merger Shares. Therefore, there will be substantial dilution to the Fusion stockholders. The Fusion stockholders will have lower equity participation in the combined company and, as a result, reduced opportunity to participate in any future earnings or growth of the combined company and future appreciation in the value of our common stock than they have prior to the Merger.

***If the Reverse Stock Split is consummated, our total market capitalization may decrease.***

If the Reverse Stock Split is effected prior to the close of the Merger, the market price per share of our common stock after the Reverse Stock Split may not increase in proportion to the reduction in the number of shares of our common stock outstanding before the Reverse Stock Split, if and when it is effected. Accordingly, the total market capitalization of our common stock (the aggregate value of all of our common stock at the then existing market price) after the Reverse Stock Split may be lower than the total market capitalization before the Reverse Stock Split. There are numerous factors and contingencies that could affect our stock price following a proposed reverse stock split, including, but not limited to, the status of the market for our stock at the time, our reported results of operations in future periods, and general economic, market and industry conditions, and the market price of our common stock may not be sustainable at the bid price following such reverse stock split.

***The existing stockholders of Fusion will comprise a minority of the combined company after the consummation of the Merger and the Birch stockholders will nominate a majority of the Board of Directors.***

If the Merger is consummated, the stockholders of Birch (through BCHI) will receive consideration equal to three times the number of shares of common stock outstanding and in-the-money Fusion warrants immediately prior the effective time of the Merger, subject to certain exceptions, making them the majority stockholders of the Company. Furthermore, under the terms of the Merger, BCHI is entitled to nominate five of the nine directors serving on the Company's board of directors after the Merger (subject to Nasdaq's independence requirements and one of the designees being subject to the reasonable consent of the Fusion committee). Accordingly, BCHI will have substantial influence over the board of directors and the operations of the Company after the consummation of the Merger.

***The number of shares issuable as consideration will not be affected by an increase the trading price of our common stock.***

The consideration payable in connection with the Merger is a fixed number of shares of common stock. Therefore, our stockholders will not be able to benefit from an increase in the trading price of our common stock during the pendency of the Merger, with respect to the consideration payable for Birch. Furthermore, the Merger Agreement does not provide Fusion with a price-based termination right, a merger consideration adjustment or other similar protection.

***We may not realize the revenue growth opportunities and cost synergies that are anticipated from the planned Merger as we may experience difficulties in integrating Birch's business with ours.***

The benefits that are expected to result from the Merger will depend, in part, on our ability to realize the anticipated revenue growth opportunities and cost synergies as a result of the planned acquisition. Our success in realizing these revenue growth opportunities and cost synergies, and the timing of this realization, depends on the successful integration of Birch. There is a significant degree of difficulty and management distraction inherent in the process of integrating an acquisition as sizable as Birch. The process of integrating operations could cause an interruption of, or loss of momentum in, our and Birch's activities. Members of our senior management may be required to devote considerable amounts of time to this integration process, which will decrease the time they will have to manage our company, service existing customers, attract new customers and develop new products or strategies. If senior management is not able to effectively manage the integration process, or if any significant business activities are interrupted as a result of the integration process, our business could suffer. There can be no assurance that we will successfully or cost-effectively integrate Birch. The failure to do so could have a material adverse effect on our business, financial condition or results of operations.

Even if we are able to integrate Birch successfully, this integration may not result in the realization of the full benefits of the growth opportunities and cost synergies that we currently expect from this integration, and we cannot guarantee that these benefits will be achieved within anticipated timeframes or at all. For example, we may not be able to eliminate duplicative costs. Moreover, we may incur substantial expenses in connection with the integration of Birch. While it is anticipated that certain expenses will be incurred to achieve cost synergies, such expenses are difficult to estimate accurately, and may exceed current estimates. Accordingly, the benefits from the planned acquisition may be offset by costs incurred to, or delays in, integrating the businesses.

***The Merger could impact or cause disruptions in our and Birch's businesses which could have an adverse effect on our business, financial condition or results of operations following the completion of the Merger.***

The Merger could cause disruption in our and Birch's businesses, including:

- our and Birch's current and prospective customers and suppliers may experience uncertainty associated with the Merger, including with respect to current or future business relationships with us, Birch or the combined business and may attempt to negotiate changes in existing business;
- our and Birch's employees may experience uncertainty about their future roles with us, which may adversely affect our and Birch's ability to retain and hire key employees;
- the Merger may give rise to potential liabilities; and
- the attention of our management and that of Birch may be directed toward the completion and implementation of the Merger and transaction-related considerations and may be diverted from the day-to-day business operations of the respective companies.

In connection with the Merger, we could also encounter additional transaction and integration-related costs or other factors such as the failure to realize all of the benefits anticipated in the Merger. The disruption to Birch's business could be exacerbated by a delay in the completion of the Merger.

***The debt we expect to incur in connection with the Merger could have a negative impact on our liquidity or restrict our activities.***

As of December 31, 2017, we had approximately $97.6 million of indebtedness outstanding. If the Merger is consummated, effective upon closing of the Merger we currently expect that our outstanding indebtedness will be approximately $580 million. New credit facilities related to the Merger will likely contain various covenants that limit our ability to engage in specified types of transactions. Our overall leverage and the terms of our financing arrangements could:

- limit our ability to obtain additional financing in the future for working capital, capital expenditures and acquisitions;
- make it more difficult to satisfy our obligations under the terms of our indebtedness;
- limit our ability to refinance our indebtedness on terms acceptable to us or at all;
- limit our flexibility to plan for and adjust to changing business and market conditions in the industries in which we operate and increase our vulnerability to general adverse economic and industry conditions;
- require us to dedicate a substantial portion of our cash flow to make interest and principal payments on our debt, thereby limiting the availability of our cash flow to fund future acquisitions, working capital, business activities, and other general corporate requirements;
- limit our ability to obtain additional financing for working capital, to fund growth or for general corporate purposes, even when necessary to maintain adequate liquidity, particularly if any ratings assigned to our debt securities by rating organizations were revised downward; and
- subject us to higher levels of indebtedness than our competitors, which may cause a competitive disadvantage and may reduce our flexibility in responding to increased competition.

In addition, the restrictive covenants could require us to maintain specified financial ratios and satisfy other financial condition tests. Our ability to meet those financial ratios and tests will depend on our ongoing financial and operating performance, which, in turn, will be subject to economic conditions and to financial, market, and competitive factors, many of which are beyond our control. A breach of any of these covenants could result in a default under the instruments governing our indebtedness.

***Birch may have liabilities that are not known, probable or estimable at this time.***

As a result of the Merger, Birch will become our subsidiary and it will remain subject to all of its liabilities. There could be unasserted claims or assessments that we failed or were unable to discover or identify in the course of performing due diligence investigations of Birch. In addition, there may be liabilities that are neither probable nor estimable at this time that may become probable or estimable in the future. Any such liabilities, individually or in the aggregate, could have a material adverse effect on our financial results. We may learn additional information about Birch that adversely affects us, such as unknown, unasserted or contingent liabilities and issues relating to compliance with applicable laws.

**Risks Related to Ownership of our Common Stock**

***We are unlikely to pay cash dividends on our common stock in the foreseeable future.***

We have never declared or paid any cash dividends on our common stock. We intend to retain any future earnings to finance our operations and expand our business and therefore do not expect to pay any cash dividends in the foreseeable future. Holders of our outstanding preferred stock are entitled to receive dividends prior to the payment of any dividends on our common stock. The payment of dividends is also subject to provisions of Delaware law prohibiting the payment of dividends except out of surplus and certain other limitations, as well as the provisions contained in our debt facilities.

***Our common stock is subject to price volatility unrelated to our operations.***

The market price of our common stock has fluctuated substantially and will likely continue to fluctuate due to a variety of factors, including market perception of our ability to achieve our planned growth, quarterly operating results of other companies in our industry, trading volume in our common stock, changes in general conditions in the economy and the financial markets or other developments affecting our competitors or us. In addition, the stock market is subject to extreme price and volume fluctuations. This volatility has had a significant effect on the market price of our common stock and securities issued by many other companies for reasons unrelated to operating performance.

In addition, the market price of our common stock may continue to fluctuate significantly in response to a number of other factors, many of which are beyond our control including, but not limited to, the following:

20

**Fusion Telecommunications International, Inc.**
*Attention: Corporate Secretary* **420 Lexington Avenue, Suite 1718**
**New York, New York 10170**

The information on our website is neither incorporated by reference herein nor otherwise made a part of this report.

**Audit Committee**

Our Audit Committee's primary function is to assist the Board in fulfilling its oversight responsibilities by reviewing the integrity of our financial statements, our internal control systems, our auditing, accounting and financial reporting processes (including those associated with the Sarbanes-Oxley Act of 2002) and the qualification and independence of our independent accountants. The Audit Committee's primary duties are to:

- serve as an independent and objective party to monitor our quarterly and annual financial reporting process and the adequacy of our internal control systems;
- review and appraise the audit efforts of our independent accountants; and
- provide an open avenue of communication among the independent accountants, financial and senior management and the Board.

To fulfill its responsibilities and duties, the Audit Committee:

- reviews and discusses with management and the independent accountants our annual audited financial statements and any reports or other financial information submitted to any governmental body or to the public;
- reviews with management and the independent accountants the Company's quarterly financial statements prior to the filing of the Company's Quarterly Reports on Form 10-Q or prior to release of earnings for the quarter;
- reviews and approves any related-party transactions;
- appoints and replaces the independent accountants and approves the professional fees to be paid to the independent accountants, including the range of audit and non-audit fees;
- reviews with the independent auditors all critical accounting policies and practices being used by the Company;
- ensures the independence of the independent accountants by preapproving all auditing and non-audit services to be performed for the Company, ensures the rotation of audit partners as required by law, and discusses with the independent auditors the matters required to be discussed by applicable auditing standards;
- reviews any significant disagreements among management and the independent accountants in connection with the preparation of the Company's financial statements;
- establishes procedures relating to the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting and auditing matters; and
- establishes, reviews and updates periodically our Code of Ethics to ensure that management has established a system to monitor and enforce our Code of Ethics.

During 2017, the members of our Audit Committee were Paul C. O'Brien – Chairman, Michael Del Giudice and Larry Blum, each of whom was a non-employee member of our Board. Our Board has determined that Michael Del Giudice is our Audit Committee Financial Expert within the meaning of SEC Rules. Our Board has also determined that each of the Directors serving on our Audit Committee is independent within the meaning of Nasdaq Rule 5605(a)(2). The Audit Committee charter is posted on our website (www.fusionconnect.com), and a copy of the charter can also be obtained by contacting our Corporate Secretary. The information on our website is neither incorporated by reference nor otherwise made a part of this report. The Audit Committee held four meetings in 2017.

**Strategic and Investment Banking Committee**

The members of our Strategic Committee are Marvin S. Rosen – Chairman, Michael Del Giudice and Philip D. Turits. Our Strategic Committee evaluates and recommends investment strategies with investment banks and brokerage houses and assists in the evaluation of potential mergers and acquisitions candidates. The Strategic Committee does not currently have a written charter. The Strategic Committee acts at the direction of the Board. The Strategic Committee held no meeting in 2017.

**Board Role in Risk Oversight**

The Board has overall responsibility for risk oversight, with a particular focus on those areas of risk that might have the most significant impact on the Company. These risk oversight responsibilities are primarily discharged through the Audit Committee and the Compensation Committee. The roles of these committees in risk evaluation are as follows:

**Audit Committee.** The Audit Committee oversees the risk management policies and practices related to the financial reporting process and to our published financial statements. In addition, the Audit Committee from time to time reviews those risk management policies and practices with executive management and our auditors, to insure full compliance and the minimization of finance-related risks.

**Compensation Committee.** The Compensation Committee oversees the risk management policies and practices related to compensation and compensation-related risks, as well as possible risks related to succession planning. This oversight responsibility specifically includes working with executive management in relation to employee compensation policies, practices and programs.

Fusion's executive officers direct the day-to-day implementation and monitoring of the management policies and practices established by the Board and its committees. As part of its periodic meetings with executive management, the Board reviews the Company's risk management policies and practices.

**Audit Committee Report**

With respect to the year ended December 31, 2017, in addition to its other work, the Audit Committee:

- reviewed and discussed with management and EisnerAmper, LLP ("EA"), our independent registered public accounting firm, our audited consolidated financial statements as of December 31, 2017 and the year then ended;
- discussed with EisnerAmper, LLP the matters required to be discussed by Statement on Auditing Standards No. 61, "Communication with Audit Committees," as amended, with respect to its review of the findings of Eisner Amper LLP during its examination of our financial statements; and
- received from EisnerAmper, LLP written affirmation of its independence as required by the Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees." In addition, the Audit Committee discussed with EisnerAmper, LLP its independence and determined that the provision of non-audit services was compatible with maintaining auditor independence.

Based on the review and discussion summarized above, the Audit Committee recommended that the Board include the audited consolidated financial statements in the 2017 Annual Report on Form 10-K for filing with the SEC.

Submitted by:

/s/ Paul C. O'Brien, Chairman
/s/ Michael Del Giudice
/s/ Larry Blum

**Shareholder Communications with Directors**

The Board recommends that communications with the Board be initiated in writing and addressed as follows:

**Fusion Telecommunications International, Inc.**
**Attention: Corporate Secretary- Shareholder Communications**
**420 Lexington Avenue, Suite 1718 New York, New York 10170**

39