# EXHIBIT 5

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

**(Mark One)**

☑  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the quarterly period ended September 30, 2018**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 001-32421**

**FUSION CONNECT, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **58-2342021** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

**420 Lexington Avenue, Suite 1718, New York, New York   10170**
(Address of principal executive offices)    (Zip Code)

**(212) 201-2400**
(Registrants telephone number, including area code)

Indicate by check mark whether the issuer (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. **Yes ☑ No ☐**

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). **Yes ☑ No ☐**

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "non-accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☑ |
| (do not check if a smaller reporting company) | | Emerging growth company | ☐ |

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    **Yes ☐ No ☑**

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date: November 7, 2018.

| **Title of Each Class** | **Number of Shares Outstanding** |
|---|---|
| Common Stock, $0.01 par value | 82,112,970 |

*Appointment of Russell P. Markman as President*

On November 7, 2018, the Board of Directors of the Company (the "Board") appointed Russell P. Markman as President of the Company effective as of the date of Mr. Hutchins' resignation. Mr. Markman will also maintain his position as the Chief Operating Officer of the Company.

Mr. Markman, age 67, has served as Acting President of the Company since June 2018 and as Chief Operating Officer of the Company since May 2018. Mr. Markman previously served as President of Business Services of the Company from January 2015 to May 2018, and the Executive Vice President of Business Services from October 2012 to January 2015. Prior to the Company's acquisition of Network Billing Systems, LLC n/k/a Fusion LLC ("NBS") in October 2012, Mr. Markman served as President of that company from January 2009 to October 2012. Prior to becoming President of NBS, Mr. Markman served as Vice President of Operations of NBS from October 2003 to October 2012. Prior to joining NBS, Mr. Markman established the alternate channel distribution program for commercial sales at RCN Corporation, where he served as Director of Commercial Sales.

There are no family relationships, as defined in Item 401 of Regulation S-K ("Item 401"), between Mr. Markman and any of the Company's executive officers or directors or persons nominated or chosen to become a director or executive officer of the Company. There is no arrangement or understanding between Mr. Markman and any other person pursuant to which Mr. Markman is to be appointed as President. There are no transactions in which Mr. Markman has an interest requiring disclosure under Item 404(a) of Regulation S-K ("Item 404").

In connection with his appointment as President, effective January 1, 2019, Mr. Markman's base salary will be increased to $400,000 and his bonus potential will be increased to 40%. Mr. Markman will also receive a grant of 375,000 shares of restricted common stock. In addition, the Company will enter into a change in control agreement with Mr. Markman, under the terms of which he will be entitled to receive six months of base salary in the event his employment with the Company is terminated without "Cause" within 6 months following a Change in Control (each as defined therein) of the Company. In addition, should his employment be so terminated following a Change in Control, any shares of restricted stock not then vested shall immediately vest.

The foregoing description of Mr. Markman's change in control agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the form of change in control agreement which is filed as Exhibit 10.4 hereto and incorporated herein by reference.

*Appointment of Keith Soldan as Chief Financial Officer*

On November 7, 2018, the Board appointed Keith Soldan as Chief Financial Officer of the Company, effective as of November 8, 2018. As previously announced, Mr. Soldan, age 42, was appointed Acting Chief Financial Officer and Principal Accounting Officer of the Company in August 2018. Mr. Soldan joined the Company in May 2018 as Vice President, Finance through the Company acquisition of Birch Communications where he served as Vice President, Corporate Finance and Accounting since March 2017. Prior to joining Birch Communications in March 2017, Mr. Soldan served as Vice President, Corporate Controller for Internap from March 2016 to March 2017 and as its Vice President, Corporate Finance from March 2014 to March 2016. Prior to joining Internap, Mr. Soldan worked at EarthLink from July 2005 through April 2014, where he held various positions including Senior Director/Divisional Chief Financial Officer. Mr. Soldan is a Certified Public Accountant.

There are no family relationships, as defined in Item 401, between Mr. Soldan and any of the Company's executive officers or directors or persons nominated or chosen to become a director or executive officer. There is no arrangement or understanding between Mr. Soldan and any other person pursuant to which Mr. Soldan is to be appointed as Chief Financial Officer. There are no transactions in which Mr. Soldan has an interest requiring disclosure under Item 404(a).

In connection with his appointment as Chief Financial Officer, effective as of January 1, 2019, Mr. Soldan's base salary will be increased to $336,000, his bonus potential will be increased to 40%. Mr. Soldan will also receive a grant of 350,000 shares of restricted common stock. In addition, the Company will enter into a change in control agreement with Mr. Soldan, under the terms of which he will be entitled to receive six months of base salary in the event his employment with the Company is terminated without "Cause" within 6 months following a Change in Control (each as defined therein) of the Company. In addition, should his employment be so terminated following a Change in Control, any shares of restricted stock not then vested shall immediately vest.

39

The foregoing description of Mr. Soldan's change in control agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the form of change in control agreement which is filed as Exhibit 10.4 hereto and incorporated herein by reference.

*Appointment of Brian George as Chief Technology Officer*

On November 7, 2018, the Board also appointed Brian George, age 36, as its Chief Technology Officer, effective as of November 8, 2018. Mr. George served as Senior Vice President of Technology and Infrastructure from March 2016 to November 2018, as Vice President, Network and System Engineering from June 2014 to March 2016, as Senior Director, Network Engineering from January 2013 to June 2014, and as Director, Network Engineering from November 2012 to January 2013. Prior to the Company's acquisition of NBS, Mr. George served as Director, Network Engineering of NBS.

*New Employment Agreement with Matthew D. Rosen*

On November 7, 2018, the Company entered into a new employment agreement with Matthew D. Rosen, the Company's Chief Executive Officer and Chairman of the Board (the "Employment Agreement"). The Employment Agreement, which is effective as of November 6, 2018, replaces the Company's existing employment agreement with Mr. Rosen dated November 5, 2015.

The Employment Agreement has an initial term that ends on October 31, 2021; however, the initial term shall automatically extend for an additional two year period unless the Company or Mr. Rosen provides the other with written notice of its/his intent to terminate the Employment Agreement no less than ninety (90) days prior to the expiration of the initial term. Under the terms of the Employment Agreement, effective December 31, 2018, Mr. Rosen's base salary will be increased to $1,000,000 per year, subject to annual reviews and increases at the discretion of the Board. The Employment Agreement also provides that Mr. Rosen will be eligible for an annual bonus or incentive compensation ranging from 50% and up to 200% of his base salary, based upon the achievement of corporate and individual performance targets determined by the Board. In addition, Mr. Rosen will receive a one-time special cash bonus in the amount of $2,383,333.28, subject to applicable withholdings, paid in six installments specified in the Employment Agreement.

Within five (5) business days of the execution of the Employment Agreement, the Company has agreed to grant Mr. Rosen 3,961,934 shares of common stock of which shares 657,682 are vested on the date of grant and the remaining 3,304,249 shares vest in equal quarterly installments over 2.5 years from the effective date of the Employment Agreement (the "Restricted Shares"). In the event of a change of control of the Company, a termination of Mr. Rosen's employment without cause, a departure by Mr. Rosen for good reason (each as described in the Employment Agreement), or a non-renewal of Mr. Rosen's employment, the Restricted Shares and any other equity-based grants held by Mr. Rosen automatically vest in full. Further, the Employment Agreement provides that if the Company sells all or substantially all of its consolidated assets or it sells more than 50% of the equity securities of the Company during the term of the Employment Agreement, Mr. Rosen will be entitled to a one-time cash bonus equal to 3% of the aggregate consideration paid/distributed to stockholders of the Company.

If Mr. Rosen is terminated due to his disability or death, he (or his estate) will receive his base pay for the remaining term of the Employment Agreement, with a minimum of six months of pay, as well as any other accrued obligations owed to Mr. Rosen. If the Company terminates Mr. Rosen without cause or if Mr. Rosen voluntary departs for good reason (each as described in the Employment Agreement), the Company is obligated to pay Mr. Rosen any amounts that have accrued and are owed to him, as well as a cash payment, in twelve (12) equal monthly installments after the date of termination, of (a) 200% of (i) his base salary and (ii) the highest annual bonus paid to Mr. Rosen during the three preceding years, and (b) any pro-rata bonus that would have otherwise been payable to Mr. Rosen had he completed the full year of employment and as if the performance metrics, if any, were met.

The Employment Agreement further provides that Mr. Rosen is entitled to participate in all benefit plans provided to key executives of the Company. The Employment Agreement provides that Mr. Rosen may not engage in or profit from a competitive business (as defined in the Employment Agreement) while the Employment Agreement is in effect.   In the event that the Employment Agreement is not renewed following expiration of the initial term or any extension, the non-compete clause will apply for a period of twelve months following Mr. Rosen's departure only if the Company elects to pay severance to Mr. Rosen in an amount equivalent to that which he would be entitled if he was terminated without Cause.

The foregoing description of the Employment Agreement is qualified in its entirety by reference to the Employment Agreement, which is filed herewith as Exhibit 10.5, and which is incorporated by reference herein.